# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-509-GEKP** |
| **v.** | : | **DATE FILED: December 5, 2017** |
| **JOHN I. WALTMAN** | : | **VIOLATIONS:** |
| **ROBERT P. HOOPES** | | **18 U.S.C. § 1956(h) (conspiracy to commit** |
| **BERNARD T. RAFFERTY** | : | **money laundering – 1 count)** |
| **KEVIN M. BIEDERMAN** | : | **18 U.S.C. § 1956(a)(3) (money laundering** |
| | | **– 3 counts)** |
| | : | **18 U.S.C. §§ 1343 & 1346 (honest services** |
| | | **wire fraud – 1 count)** |
| | : | **18 U.S.C. §§ 1341 & 1346 (honest services** |
| | | **mail fraud – 3 counts)** |
| | : | **18 U.S.C. § 1951(a) (Hobbs Act extortion** |
| | | **– 6 counts)** |
| | : | **18 U.S.C. § 1512(b)(1) (witness tampering** |
| | | **– 1 count)** |
| | : | **18 U.S.C. § 215(a)(2) (bank bribery** |
| | | **– 1 count)** |
| | : | **18 U.S.C. § 1952 (Travel Act – 3 counts)** |
| | : | **18 U.S.C. §§ 1343 & 1349 (wire fraud –** |
| | | **2 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |
| | | **Notices of Forfeiture** |

## <u>SECOND SUPERSEDING INDICTMENT</u>

## COUNT ONE
## (Conspiracy to Commit Money Laundering)

**THE GRAND JURY CHARGES THAT:**

At all times material to this Superseding Indictment:

### A.    The Defendants

1.      Defendant JOHN I. WALTMAN was a Magisterial District Judge in Bucks County, Pennsylvania, who presided over Bucks County District Court, Magisterial District No. 07-01-06, located at 1500 Desire Avenue, Feasterville, Pennsylvania.  Defendant WALTMAN was appointed as a Bucks County Magisterial District Judge in October 2010 and was elected in November 2011 to a six-year term in that position, which began in January 2012.  During this time frame, Bucks County had 20 magisterial district courts comprising 20 judges and approximately 113 judicial clerks.  Magisterial District courts were responsible for adjudicating all traffic and non-traffic citations as well as processing criminal and private criminal complaints, including arraignments and preliminary hearings, the handling of civil and landlord tenant complaints up to a jurisdictional limit of $12,000, and parking violations.

2.      Defendant ROBERT P. HOOPES had been the Director of Public Safety in Lower Southampton Township, Pennsylvania ("LST") since February 10, 2016.  In this position, defendant HOOPES had authority over all police, fire, and emergency operations in LST.  Defendant HOOPES previously operated a legal practice in the Doylestown, Pennsylvania area.

3.      Defendant BERNARD T. RAFFERTY had been a Pennsylvania Deputy Constable in Bucks County since about 1998.  Under Pennsylvania law, deputy constables were public officials who are appointed by elected constables.  Constables and deputy constables were considered law enforcement officers in Pennsylvania and could execute arrest warrants, among

2

other powers.  Defendant RAFFERTY controlled RAFF'S CONSULTING LLC, a corporation

registered with the Pennsylvania Department of State on May 30, 2011.

4.       Defendant KEVIN M. BIEDERMAN held the position of Business

Development Manager at Philadelphia Federal Credit Union ("PFCU") from about 2012 until

about March 2016.

**B.       The Financial Institutions**

5.       PFCU was a financial institution engaged in interstate commerce and

insured by the National Credit Union Administration.

6.       Customers Bank was a financial institution engaged in interstate

commerce and insured by the Federal Deposit Insurance Corporation.

**THE CONSPIRACY**

7.       From in or about June 2015 to in or about November 2016, in the Eastern

District of Pennsylvania, defendants

**JOHN I. WALTMAN,
ROBERT P. HOOPES,
BERNARD T. RAFFERTY,
and
KEVIN M. BIEDERMAN**

conspired and agreed, together and with persons known and unknown to the grand jury, to

commit offenses under Title 18, United States Code, Sections 1956(a)(3) and 2, that is, to

conduct, attempt to conduct, and aid and abet the conducting of, financial transactions involving

property represented to them by undercover law enforcement officers and a cooperating witness

("CW"), working at the direction of federal officials, to be the proceeds of health care fraud,

illegal drug trafficking, and bank fraud, in violation of Title 18, United States Code, Section

1347, Title 21, United States Code, Section 841, and Title 18, United States Code, Section 1344,

3

respectively, with the intent to conceal or disguise the nature, location, source, ownership, and control of property believed to be the proceeds of the specified unlawful activities.

## MANNER AND MEANS

It was part of the conspiracy that:

8.      Defendants JOHN I. WALTMAN, ROBERT P. HOOPES, and BERNARD T. RAFFERTY conducted three money laundering transactions, totaling approximately $400,000 in cash, which undercover law enforcement officers and a CW, working at the direction of federal officials, had represented to defendants WALTMAN, HOOPES, and RAFFERTY to be the proceeds of health care fraud and illegal drug trafficking.  As a result of these three money laundering transactions, defendants WALTMAN, HOOPES, and RAFFERTY pocketed money laundering fees totaling approximately $80,000 in cash.  Defendants WALTMAN, HOOPES, and RAFFERTY paid a small portion of these money laundering fees to defendant KEVIN M. BIEDERMAN, who prepared bogus documents for the money laundering transactions.

9.      To execute each money laundering transaction:

a.      Defendant ROBERT P. HOOPES withdrew funds from his account at Customers Bank and provided the funds for deposit into RAFF's CONSULTING's account at PFCU.  Defendant BERNARD T. RAFFERTY then obtained a check drawn on RAFF's CONSULTING's account at PFCU in an amount equal to 80% of the total amount of cash to be laundered for undercover law enforcement officers.

b.      At the direction of defendants JOHN I. WALTMAN, ROBERT P. HOOPES, and BERNARD T. RAFFERTY, defendant KEVIN M. BIEDERMAN prepared bogus documents – including invoices to RAFF's CONSULTING, non-disclosure agreements,

consulting agreements, zoning applications, land surveys, and other sham documents, all of which provided a pretext for the money laundering transactions – which defendant HOOPES provided to undercover law enforcement officers.

   c. Defendant ROBERT P. HOOPES drove an unmarked LST Police Department car to an office building in Feasterville-Trevose, Pennsylvania, carrying with him the check from RAFF's CONSULTING and the bogus documents.  Undercover law enforcement officers arrived at this office building with a duffel bag full of at least $100,000 in cash, which defendants JOHN I. WALTMAN, HOOPES, and BERNARD T. RAFFERTY believed to be the proceeds of health care fraud and illegal drug trafficking.

   d. Inside the office building, defendant ROBERT P. HOOPES, whose LST Police Department badge was visible on his belt during at least one money laundering transaction, exchanged the RAFF's CONSULTING check and the bogus documents for the cash from the undercover law enforcement officers.  Meanwhile, defendants JOHN I. WALTMAN and BERNARD T. RAFFERTY waited in defendant RAFFERTY's car, which was parked outside the office building.

   e. After taking this cash from undercover law enforcement officers, defendant ROBERT P. HOOPES pocketed his agreed share of the money laundering fee. Defendant HOOPES then walked outside the office building and handed a bag of the remaining cash to defendants JOHN I. WALTMAN and BERNARD T. RAFFERTY.

   f. Defendants JOHN I. WALTMAN and BERNARD T. RAFFERTY drove the cash in defendant RAFFERTY's car to PFCU's headquarters at 12800 Townsend Road, Philadelphia, Pennsylvania.  After defendants WALTMAN and RAFFERTY each pocketed their agreed share of the money laundering fee, defendant RAFFERTY carried the

remaining cash into PFCU's headquarters and deposited it into RAFF's CONSULTING's account.

10.     In addition, defendants JOHN I. WALTMAN, ROBERT P. HOOPES, and BERNARD T. RAFFERTY attempted to broker the sale of a bar located in the Feasterville-Trevose, Pennsylvania area to undercover law enforcement officers, whom defendants WALTMAN, HOOPES, and RAFFERTY believed would use the bar to further launder proceeds from health care fraud and illegal drug trafficking.  Defendants WALTMAN, HOOPES, and RAFFERTY required a broker's fee of at least 10% of the bar's sales price.

11.     Moreover, defendants JOHN I. WALTMAN, ROBERT P. HOOPES, and BERNARD T. RAFFERTY planned to obtain a sham default judgment in a Bucks County court and then fraudulently enforce the sham default judgment in order to obtain purported funds represented by undercover law enforcement officers to be bank fraud proceeds that had been frozen in an overseas account.  Defendants WALTMAN, HOOPES, and RAFFERTY required a money laundering fee of one-third of the bank fraud proceeds that they successfully repatriated from overseas to the United States.

All in violation of Title 18, United States Code, 1956(h).

## COUNTS TWO THROUGH FOUR
### (Money Laundering)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 6 and 8 through 11 of Count One are incorporated here.

2.      Defendants JOHN I. WALTMAN, ROBERT P. HOOPES, BERNARD T. RAFFERTY, and KEVIN M. BIEDERMAN conducted financial transactions involving property represented to them by undercover law enforcement officers and a cooperating witness ("CW"), working at the direction of federal officials, to be the proceeds of health care fraud and illegal drug trafficking, in violation of Title 18, United States Code, Section 1347, and Title 21, United States Code, Section 841, respectively.

3.      On or about the dates set forth below, in the Eastern District of Pennsylvania, defendants

**JOHN I. WALTMAN,**
**ROBERT P. HOOPES,**
**BERNARD T. RAFFERTY,**
**and**
**KEVIN M. BIEDERMAN**

knowingly conducted, attempted to conduct, and aided and abetted the conducting of, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION OF THE TRANSACTION |
|-------|------|-------------------------------|
| TWO | June 22, 2016 | Defendants WALTMAN, HOOPES, RAFFERTY, and BIEDERMAN exchanged a check for $80,000 drawn on RAFF's CONSULTING's account at PFCU and bogus documents for $100,000 in cash, represented to them as proceeds of health care fraud.  After taking a money laundering fee of $20,000 in cash, defendants WALTMAN, HOOPES, and RAFFERTY deposited $80,000 in cash into RAFF's CONSULTING's account at PFCU. |

| THREE | July 6, 2016 | Defendants WALTMAN, HOOPES, RAFFERTY, and BIEDERMAN exchanged a check for $160,000 drawn on RAFF's CONSULTING's account at PFCU and bogus documents for $200,000 in cash, represented to them as proceeds of health care fraud.  After taking a money laundering fee of $40,000 in cash, defendants WALTMAN, HOOPES, and RAFFERTY deposited $160,000 in cash into RAFF's CONSULTING's account at PFCU. |
| FOUR | August 24, 2016 | Defendants WALTMAN, HOOPES, RAFFERTY, and BIEDERMAN exchanged a check for $80,000 drawn on RAFF's CONSULTING's account at PFCU and bogus documents for $100,000 in cash, represented to them as proceeds of illegal drug trafficking.  After taking a money laundering fee of $20,000 in cash, defendants WALTMAN, HOOPES, and RAFFERTY deposited $80,000 in cash into RAFF's CONSULTING's account at PFCU. |

4.      When conducting the financial transactions described in paragraph 3 above, defendants JOHN I. WALTMAN, ROBERT P. HOOPES, BERNARD T. RAFFERTY, and KEVIN M. BIEDERMAN acted with the intent to conceal or disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activities.

All in violation of Title 18, United States Code, Sections 1956(a)(3) and 2.

## COUNT FIVE
### (Honest Services Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 6 and 8 through 11 of Count One are incorporated here.

2.      At all times material to Count Five:

      a.      Bucks County, its citizens, Magisterial District No. 07-01-06, and the litigants of Magisterial District Court had an intangible right to the honest services of defendant JOHN I. WALTMAN. As a Magisterial District Judge in Bucks County, defendant WALTMAN owed Bucks County, its citizens, Magisterial District No. 07-01-06, and the litigants of Magisterial District Court a duty to, among other things, refrain from receiving bribes and kickbacks in exchange for WALTMAN's official action and influence, and for violating his duties as a Magisterial District Judge. Moreover, under Pennsylvania's Code of Judicial Conduct ("CJC"), defendant WALTMAN had a legal duty to, among other things: (1) comply with the law, including the CJC; (2) not abuse the prestige of judicial office to advance his or others' personal or economic interests, or allow others to do so; (3) uphold and apply the law, and perform all duties of judicial office fairly and impartially; (4) not permit financial interests to influence his judicial conduct or judgment; (5) not convey or permit others to convey the impression that anyone was in a position to influence him; (6) not initiate, permit, or consider ex parte communications concerning a pending or impending matter; (7) not make pledges, promises, or commitments in cases that are inconsistent with the impartial performance of the adjudicative duties of his judicial office; (8) not participate in activities that would reasonably appear to undermine his independence, integrity, or impartiality; (9) engage in conduct that would reasonably appear to be coercive; (10) not consult with an executive or legislative body;

and (11) not accept any gifts, loans, benefits, or other things of value, if acceptance is prohibited by law or would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality.

b.      Lower Southampton Township ("LST") and its citizens had an intangible right to the honest services of defendant ROBERT P. HOOPES.  As the Director of Public Safety of LST, defendant HOOPES owed LST and its citizens a duty to, among other things, refrain from receiving bribes and kickbacks in exchange for defendant HOOPES' official action and influence, and for violating his duties as Director of Public Safety.

c.      Bucks County, its citizens, Magisterial District No. 07-01-06, and the litigants of Magisterial District Court had an intangible right to the honest services of defendant BERNARD T. RAFFERTY.  As a Deputy Constable in Bucks County, defendant RAFFERTY owed Bucks County, its citizens, Magisterial District No. 07-01-06, and the litigants of Magisterial District Court a duty to, among other things, refrain from receiving bribes and kickbacks in exchange for defendant RAFFERTY's official action and influence, and for violating his duties as a Deputy Constable.

3.      On or about September 30, 2016, the cooperating witness ("CW") met with defendants JOHN I. WALTMAN and ROBERT P. HOOPES and alerted them that an "associate" of an undercover law enforcement officer had been issued a traffic citation by the Pennsylvania State Police ("PSP").  Defendants WALTMAN and HOOPES reviewed the traffic citation and determined that the resulting traffic case would be within defendant WALTMAN's jurisdiction in Magisterial District No. 07-01-06.  The CW offered $1,000 in cash or "whatever it takes" for defendant WALTMAN to "fix" the traffic case for the "associate."  In this meeting, defendants WALTMAN and HOOPES corruptly agreed to attempt to "fix" the traffic case for

10

the "associate."  In this meeting and in later conversations, the CW also discussed future money laundering fees and broker fees that could be paid to defendants WALTMAN and HOOPES if WALTMAN would "fix" the traffic case for the "associate."

## THE SCHEME

4.      From on or about September 30, 2016 through on or about November 3, 2016, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN I. WALTMAN,**
**ROBERT P. HOOPES,**
**and**
**BERNARD T. RAFFERTY**

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud and deprive through bribery the citizens of Bucks County and Lower Southampton Township, their citizens, Magisterial District No. 07-01-06, and the litigants of Magisterial District Court of their intangible right to the honest services of defendants WALTMAN, HOOPES, and RAFFERTY.

## MANNER AND MEANS

It was part of the scheme to defraud that:

5.      Defendants JOHN I. WALTMAN, ROBERT P. HOOPES, and BERNARD T. RAFFERTY accepted a bribe of $1,000 from a cooperating witness ("CW"), working at the direction of federal officials, and the promise of future money laundering fees and broker fees from undercover law enforcement officers, in exchange for defendants WALTMAN, HOOPES and RAFFERTY using their positions as public officials to "fix" the traffic case for the "associate."  Specifically, WALTMAN, HOOPES and RAFFERTY arranged to have WALTMAN, during court proceedings, dismiss the traffic citation issued to the "associate."

6.      To execute this scheme:

a.      Defendant ROBERT P. HOOPES forged the purported signature of the "associate" on a paper copy of the traffic citation to plead not guilty and request a summary trial.  Defendant JOHN I. WALTMAN then took possession of the paper copy of the traffic citation issued to the "associate."

b.      Defendants JOHN I. WALTMAN and ROBERT P. HOOPES selected Attorney #1, known to the grand jury, to represent the "associate" at the summary trial before defendant WALTMAN.  Attorney #1 later designated Attorney #2, known to the grand jury, to represent the "associate" at the summary trial.

c.      Defendants BERNARD T. RAFFERTY and ROBERT P. HOOPES provided status updates to the CW regarding whether PSP had electronically filed the traffic citation with the Magisterial District Court and the scheduling of a summary trial before defendant JOHN I. WALTMAN.

d.      Defendants JOHN I. WALTMAN and BERNARD T. RAFFERTY submitted to Magisterial District Court staff the paper copy of the traffic citation – carrying defendant ROBERT P. HOOPES's forgery of the signature of the "associate" – to enter a plea of not guilty on behalf of the "associate" and to request a summary trial before defendant WALTMAN.  Defendant RAFFERTY also submitted the $50 court fee for the "associate."  In addition, defendant WALTMAN submitted the name of Attorney #1 as the attorney for the "associate."  As a result of these submissions by WALTMAN and RAFFERTY, Magisterial District Court staff mailed notices of the summary trial to the "associate," PSP, and Attorney #1.

e.      Defendants JOHN I. WALTMAN and ROBERT P. HOOPES provided assurances to the CW that defendant WALTMAN would dismiss the traffic citation issued to the "associate."  Further, defendants WALTMAN and HOOPES inquired with the CW

when the next money laundering transactions with undercover law enforcement officers would take place, which would have resulted in additional money laundering fees for defendants WALTMAN, HOOPES, and RAFFERTY.  Moreover, WALTMAN and HOOPES inquired with the CW whether the undercover law enforcement officers were going to purchase the bar located in the Feasterville-Trevose, Pennsylvania area, which would have resulted in broker's fees for WALTMAN, HOOPES, and RAFFERTY.  The CW indicated to WALTMAN and HOOPES that the undercover law enforcement officers wanted to confirm that WALTMAN had "fixed" the traffic case for the "associate" before continuing such transactions with WALTMAN, HOOPES, and RAFFERTY.

       f.      Defendant ROBERT P. HOOPES collected the $1,000 cash bribe from the CW in exchange for defendant JOHN I. WALTMAN "fixing" the traffic case on behalf of the "associate."

       g.      Minutes before Attorney #2 walked into the courtroom for the summary trial for the "associate," defendant ROBERT P. HOOPES provided Attorney #2 with written instructions to make a particular argument that defendant JOHN I. WALTMAN would rely upon to dismiss the citation issued to the "associate."

       h.      After presiding over the summary trial, defendant JOHN I. WALTMAN dismissed the traffic citation issued to the "associate" – over the objections of the PSP Trooper who issued the traffic citation – pursuant to the corrupt agreement to "fix" the traffic case.  In dismissing the traffic citation, defendant WALTMAN relied on the specific argument that defendant ROBERT P. HOOPES provided in written instructions to Attorney #2.

       i.      After the summary trial, defendant ROBERT P. HOOPES sent a text message and called the CW to confirm that defendant JOHN I. WALTMAN had dismissed

the traffic citation issued to the "associate" pursuant to the corrupt agreement to "fix" the traffic case.  In addition, during this phone call, defendant HOOPES again inquired with the CW as to when the next money laundering transactions with undercover law enforcement officers would take place.

### THE WIRE

7.     On or about October 5, 2016, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN I. WALTMAN,
ROBERT P. HOOPES,
and
BERNARD T. RAFFERTY**

for the purpose of executing the scheme and artifice to defraud, attempting to do so, and aiding and abetting its execution, transmitted and caused to be transmitted in interstate commerce by means of wire communication the following writings, signs, signals, pictures, and sounds: a text message from defendant HOOPES, in the Eastern District of Pennsylvania, to an undercover law enforcement officer, in New York, stating, "Anytime," in response to the undercover law enforcement officer's text message thanking defendants WALTMAN, HOOPES, and RAFFERTY for corruptly agreeing to "fix" the traffic case for the "associate," and in anticipation of WALTMAN, HOOPES, and RAFFERTY receiving future money laundering fees and broker fees from undercover law enforcement officers.

In violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS SIX THROUGH EIGHT
### (Honest Services Mail Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.       Paragraphs 1 through 3, 5, and 6 of Count Five are incorporated here.

### THE MAILINGS

       2.       On or about the dates set forth below, in the Eastern District of

Pennsylvania, defendants

**JOHN I. WALTMAN,**
**ROBERT P. HOOPES,**
**and**
**BERNARD T. RAFFERTY,**

for the purpose of executing the scheme and artifice to defraud described in the paragraphs

incorporated in paragraph 1 of these Counts Six through Eight, attempting to do so, and aiding

and abetting its execution, caused to be delivered by mail, according to the direction thereon,

certain mail matter, as set forth below:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION OR MAILING |
|---|---|---|
| SIX | October 18, 2016 | Mailing from Magisterial District No. 07-01-06 in Bucks County, Pennsylvania to the "associate" enclosing notice of the summary trial, scheduled before defendant WALTMAN, regarding the traffic citation issued to the "associate" |
| SEVEN | October 18, 2016 | Mailing from Magisterial District No. 07-01-06 in Bucks County, Pennsylvania to PSP enclosing notice of the summary trial, scheduled before defendant WALTMAN, regarding the traffic citation issued to the "associate" |
| EIGHT | October 18, 2016 | Mailing from Magisterial District No. 07-01-06 in Bucks County, Pennsylvania to Attorney #1 enclosing notice of the summary trial, scheduled before defendant WALTMAN, regarding the traffic citation issued to the "associate" |

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

## COUNT NINE
### (Hobbs Act Extortion under Color of Official Right)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 3, 5, and 6 of Count Five are incorporated here.

2.      From on or about September 30, 2016 through on or about November 3, 2016, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN I. WALTMAN,**
**ROBERT P. HOOPES,**
**and**
**BERNARD T. RAFFERTY**

knowingly obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and aided and abetted that conduct; that is, defendants WALTMAN, HOOPES, and RAFFERTY, while public officials, engaged in a course of conduct whereby WALTMAN, HOOPES, and RAFFERTY obtained, under color of official right, a bribe payment of $1,000, and agreed to obtain future money laundering fees and broker fees from undercover law enforcement officers, which money was not due to WALTMAN, HOOPES, and RAFFERTY.

In violation of Title 18, United States Code, Sections 1951(a) and 2.

16

## COUNT TEN
## (Witness Tampering)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.       Paragraphs 1 through 3, 5, and 6 of Count Five are incorporated here.

      2.       In or about January 2017, in the Eastern District of Pennsylvania,

defendant

### ROBERT P. HOOPES

knowingly attempted to corruptly persuade and engaged in misleading conduct toward Attorney

#1, known to the grand jury, with the intent to influence the testimony of Attorney #1 in an

official proceeding, that is, the federal grand jury, by advising Attorney #1 to lie and falsely

testify to the federal grand jury that defendant HOOPES paid $1,000 to Attorney #1 to represent

the "associate" when HOOPES knew, in fact, that he did not pay this $1,000 to Attorney #1.

      In violation of Title 18, United States Code, Section 1512(b)(1).

## COUNT ELEVEN
### (Bank Bribery)

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about June 4, 2015, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### KEVIN M. BIEDERMAN,

an employee of Philadelphia Federal Credit Union ("PFCU"), a financial institution, corruptly solicited and demanded for the benefit of himself, and corruptly accepted and agreed to accept, approximately $1,600 in United States currency, intending to be influenced and rewarded in connection with the business and transactions of PFCU, in that defendant BIEDERMAN offered and agreed to influence PFCU's approval of a loan in exchange for the bribe.

All in violation of Title 18, United States Code, Section 215(a)(2).

## COUNT TWELVE
### (Hobbs Act Extortion Under Color of Official Right)

**THE GRAND JURY FURTHER CHARGES THAT**:

1.      Paragraph 1 of Count One and Paragraph 2.a. of Count Five are incorporated here.

2.      At all times relevant to Count Twelve:

a.      As the Magisterial District Judge in Bucks County and the former chair of the Lower Southampton Republican Committee, defendant JOHN I. WALTMAN had actual and perceived influence over actions taken by and on behalf of LST by LST's Board of Supervisors, Solicitor, officers, and/or employees.

b.      Business Owner #1 operated an engineering and land surveying firm, located in Bucks County, that was engaged in and affecting interstate commerce.  Business Owner #1's firm frequently performed engineering and surveying work for LST.

c.      In or about the summer of 2014, defendant JOHN I. WALTMAN visited Business Owner #1's engineering and land surveying firm and extorted Business Owner #1 for approximately $2,000, which defendant WALTMAN collected the following day.

d.      In or about the summer of 2015, defendant JOHN I. WALTMAN visited Business Owner #1's engineering and land surveying firm and extorted Business Owner #1 for approximately $2,000, which defendant WALTMAN collected the following day.

3.      From in or about June 2014 to in or about August 2015, in the Eastern District of Pennsylvania, defendant

**JOHN I. WALTMAN**

knowingly obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, defendant WALTMAN, while a public official, engaged in a course of conduct whereby WALTMAN obtained, under color of official right, payments of $4,000 from Business Owner #1, which money was not due to WALTMAN.

All in violation of Title 18, United States Code, Section 1951(a).

## COUNT THIRTEEN
### (Hobbs Act Extortion Under Color of Official Right)

**THE GRAND JURY FURTHER CHARGES THAT**:

        1.      Paragraphs 1 and 2.a. of Count Twelve are incorporated here.

        2.      At all times relevant to Count Thirteen:

        a.      As the incoming Director of Public Safety of LST, defendant ROBERT P. HOOPES had actual and perceived influence over actions taken by and on behalf of LST by LST's Board of Supervisors, Solicitor, officers, and/or employees.

        b.      Person #1 was a resident of Philadelphia who was engaged in interstate commerce.

        c.      In or about August 2015, defendants JOHN I. WALTMAN and ROBERT P. HOOPES, in anticipation of defendant HOOPES becoming LST's new Director of Public Safety, offered Person #1 a new towing contract with LST to replace one of the towing companies that then did business with LST.  Defendants WALTMAN and HOOPES instructed Person #1 to pay WALTMAN and HOOPES a "kickback" of Person #1's towing income.

        3.      In or about August 2015, in the Eastern District of Pennsylvania, defendants

### JOHN I. WALTMAN
### and
### ROBERT P. HOOPES

knowingly obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and aided and abetted that conduct; that is, defendants WALTMAN and HOOPES, while a public official and incoming public official, respectively, engaged in a course of conduct whereby WALTMAN and HOOPES attempted to

21

obtain, under color of official right, payments from Person #1, which money was not due to

WALTMAN and HOOPES.

       All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FOURTEEN
### (Hobbs Act Extortion Under Color of Official Right)

**THE GRAND JURY FURTHER CHARGES THAT**:

      1.     Paragraphs 1 and 2.a. of Count Twelve are incorporated here.

      2.     At all times relevant to Count Fourteen:

      a.     Business Owner #2 was a resident of Bucks County who was engaged in interstate commerce.

      b.     Business Owner #3 has owned and operated several businesses in or around Bucks County that were engaged in and affected interstate commerce.

      c.     In or about October 2015, in defendant JOHN I. WALTMAN's chambers at the Bucks County District Court, defendant WALTMAN met with Business Owner #2 and Business Owner #3.  In this meeting, defendant WALTMAN stated that he would grant Business Owner #2 a new towing contract with LST to replace one of the towing companies that then did business with LST.  Defendant WALTMAN instructed Business Owner #2 to pay WALTMAN a "kickback" of approximately 25% of Business Owner #2's towing income.  In addition, WALTMAN instructed Business Owner #2 to place this new towing company in the name of Business Owner #3, for which Business Owner #2 would pay approximately $25,000 to Business Owner #3.

      3.     In or about October 2015, in the Eastern District of Pennsylvania, defendant

### JOHN I. WALTMAN

knowingly obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, defendant WALTMAN, while a public

23

official, engaged in a course of conduct whereby WALTMAN attempted to obtain, under color

of official right, payments from Business Owner #2, which money was not due to WALTMAN.

All in violation of Title 18, United States Code, Section 1951(a).

## COUNT FIFTEEN
### (Hobbs Act Extortion Under Color of Official Right)

**THE GRAND JURY FURTHER CHARGES THAT**:

1.      Paragraphs 1 and 2.a. of Count Twelve and Paragraph 2.a. of Count Thirteen are incorporated here.

2.      At all times relevant to Count Fifteen:

a.      Business Owner #4 led an investment firm, headquartered in Florida, that was engaged in and affecting interstate commerce.  Business Owner #4 investment firm owned commercial property in LST which it wanted to redevelop.

b.      From in or about July 2014 to in or about July 2015, defendants JOHN I. WALTMAN and ROBERT P. HOOPES extorted Business Owner #4 to have Business Owner #4's firm sell its commercial property in LST to a specific buyer in order for Business Owner #4's firm to avoid zoning and/or regulatory obstacles in LST for any redevelopment of Business Owner #4's firm's commercial property.

3.      From in or about July 2014 to in or about July 2015, in the Eastern District of Pennsylvania, defendants

**JOHN I. WALTMAN**
**and**
**ROBERT P. HOOPES**

knowingly obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and aided and abetted that conduct; that is, defendants WALTMAN and HOOPES, while a public official and incoming public official, respectively, engaged in a course of conduct whereby WALTMAN and HOOPES attempted to

obtain, under color of official right, payments and property from Business Owner #4, which money and property were not due to WALTMAN and HOOPES.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNTS SIXTEEN THROUGH EIGHTEEN
### (Use of Interstate Facilities to Promote
### and Facilitate Bribery Contrary to Pennsylvania Law)

**THE GRAND JURY FURTHER CHARGES THAT**:

1.      Paragraphs 1 and 2 of Count One and Paragraphs 1 and 2.a. of Count Twelve are incorporated here.

2.      At all times relevant to Counts Sixteen through Eighteen:

a.      As Public Safety Director of LST, defendant ROBERT P. HOOPES had actual and perceived influence over actions taken by and on behalf of LST by LST's Board of Supervisors, Solicitor, officers, and employees.

b.      Solicitor #1 was an attorney who practiced in the fields of municipal law, land use, and zoning at a law firm with offices in Bucks County and Montgomery County, Pennsylvania.  From in or about January 2014 through in or about December 2016, Solicitor #1 also served as the Solicitor in LST, a Second Class Township under Pennsylvania law.  As LST's chief legal adviser, Solicitor #1 had actual and perceived authority over legal matters in LST and had actual and perceived influence over actions taken by and on behalf of LST by LST's Board of Supervisors, officers, and employees.  The Commonwealth of Pennsylvania's Second Class Township Code, P.L. 103, No. 69, 53 P.S. § 65101, *et. seq*. provided, in pertinent part: "The township solicitor, when directed or requested to do so, shall prepare or approve any bonds, obligations, contracts, leases, conveyances, ordinances and assurances to which the township may be a party.  The township solicitor shall … do every professional act incident to the office which the township solicitor may be authorized or required to do by the board of supervisors or by any resolution.  The township solicitor shall furnish the board of supervisors, upon request, with an opinion in writing upon any question of law."

27

   c. Salesman #1 was a vice president of an outdoor advertising

company headquartered in Delaware County, Pennsylvania ("Company #1").

   d. Person #2 was a Bucks County businessman and an associate of

defendant WALTMAN and Salesman #1.

### Company #1's Efforts to Place a Two-Sided Digital Billboard in LST

   3. Beginning in at least March 2016, Salesman #1 and Company #1 (through

its subsidiary) were seeking to place a two-sided digital advertising billboard in LST's Russell

Elliott Memorial Park.  On or about May 6, 2016, Salesman #1 sent a term sheet to Solicitor #1

in which Company #1 offered LST annual payments of $48,000 over a lease term of

approximately 30 years for Company #1's rights to construct the billboard in Russell Elliott

Memorial Park.

   4. In or about May 2016, Solicitor #1 and LST's Board of Supervisors and

officers agreed that Company #1's offer of $48,000 per year was too low.  Specifically, they

agreed that Company #1's offer should at least approach $68,000 per year, which was the lease

rate that LST was then receiving from another company for a one-sided digital advertising

billboard in LST.  Further, Solicitor #1 and LST's Board of Supervisors and officers discussed

using lease revenues from Company #1's proposed billboard for both capital improvements to

LST's municipal parks and LST's general funds.

   5. On or about November 8, 2016, Salesman #1 sent a revised term sheet to

Solicitor #1 in which Company #1 increased its offer to LST to annual payments of $60,000 over

a lease term of approximately 30 years for Company #1's proposed billboard in Russell Elliott Memorial Park.

### Formation of the Unlawful Bribery Arrangement

6.       From at least in or about November 8, 2016 to in or about December 16, 2016, defendants JOHN I. WALTMAN and ROBERT P. HOOPES solicited and entered into an unlawful arrangement with Salesman #1 pursuant to which defendants WALTMAN and HOOPES would solicit, accept, and agree to accept concealed bribe payments – through RAFF's CONSULTING – from Company #1 and, as consideration and in exchange for these bribe payments, defendants WALTMAN and HOOPES would reciprocate by agreeing to influence actions taken by and on behalf of LST's Board of Supervisors, LST's officers, and Solicitor #1 to accept Company #1's lease offer for Company #1's proposed billboard in LST's Russell Elliott Memorial Park.

7.       Specifically, on or about November 8, 2016, Salesman #1 asked defendant ROBERT P. HOOPES if someone could influence LST's Board of Supervisors to take a favorable view of Company #1's increased lease offer of $60,000 per year for Company #1's proposed billboard.  Defendant HOOPES stated, "Yeah, I can do that," and "I'll make it happen."  Defendant HOOPES asked Salesman #1, "We're in on that, right?"  In addition, defendant HOOPES asked, "We talked, and when that happens, right, we met with the Judge, and there is a trickle-down, right?"  Defendant HOOPES further stated, "There was going to be trickle-down.  We were going to get money if we make it happen."  Defendant HOOPES confirmed that defendants JOHN I. WALTMAN and HOOPES would use RAFF's CONSULTING to receive payments from Company #1 in exchange for WALTMAN and

HOOPES to use their influence with LST's Board of Supervisors to accept Company #1's increased lease offer.

8.      Later on or about November 8, 2016, in another discussion between defendant ROBERT P. HOOPES and Salesman #1, Salesman #1 offered a one-time payment of $3,000 to RAFF's CONSULTING.  Salesman #1 stated that he could make RAFF's CONSULTING a "vendor" on the billboard construction project, which "keeps it nice and clean."  Defendant HOOPES stated that he believed RAFF's CONSULTING would receive annual payments from Company #1.  After Salesman #1 balked at the prospect of annual payments to RAFF's CONSULTING, defendant HOOPES instructed Salesman #1 to call defendant JOHN I. WALTMAN to determine whether Company #1 could instead make a one-time payment to RAFF's CONSULTING.

9.      Also later on or about November 8, 2016, Salesman #1 called defendant JOHN I. WALTMAN to discuss the amount of Company #1's payment to RAFF's CONSULTING.  During this call, defendant WALTMAN stated his expectation that there would be an annual payment to RAFF's CONSULTING.  Salesman #1 stated that the $3,000 payment to RAFF's CONSULTING was "a good thing" because he could "bake this in as a line item, as part of our build cost, which is nice and neat, and nice and clean.  What I didn't want to do is make a separate, like, referral payment outside of the build costs." Defendant WALTMAN stated, "Right, right, because it shows bells and alarms.  I get it."  Salesman #1 stated, "Exactly." Defendant WALTMAN stated that someone from a local organization was objecting to Company #1's proposed billboard project.  Salesman #1 stated, "I'm trying to get you guys." Defendant WALTMAN later stated, "Try to do more than three. Try to do it around, probably four or five, it's a done deal."  Defendant WALTMAN further instructed Salesman #1 to "try to

get it closer to five, and then we will be good, alright?"  Salesman #1 stated that increasing the payment to RAFF's CONSULTING would be difficult.  Defendant WALTMAN stated, "We kept our word.  You know, we delivered on this.  Let me think about it, and I'll get back to you, alright?"  Defendant WALTMAN stated "the agreement" was that Company #1's lease offer was supposed to be voted on and supported by LST's Board of Supervisors the following evening.  Defendant WALTMAN further stated, "Let me talk it over with the gang, and make sure everybody is happy.  And try to make them swallow that pill, okay?"  Salesman #1 thanked defendant WALTMAN.

### The Charges

10.     On or about the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN I. WALTMAN**
**and**
**ROBERT P. HOOPES**

knowingly and intentionally used and caused, procured, aided, abetted, and induced the use of facilities in interstate commerce, as set forth below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity – namely, bribery contrary to 18 Pa. C. S. § 4701 – and, thereafter, performed and attempted to perform acts to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, and caused, procured, aided, abetted, and induced such conduct, as set forth below:

31

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| SIXTEEN | On or about November 8, 2016, at approximately 3:12 p.m., defendant WALTMAN sent a text message in interstate commerce to Salesman #1 stating, "Hey [Salesman #1] sounds like you did a really good job sorry to say that the opposition from certain leaders from [local organizations] have decided to combat your sign location I don't think the board will want to make that decision with all the controversy starting to come your way Good luck for trying"[1] | (a)  On November 8, 2016, at approximately 4:12 p.m., defendant WALTMAN called Person #2.  During this call, WALTMAN stated that Salesman #1 "was not keeping his obligation because "he changed his conditions on what he was going to do to take care of everybody."  Defendant WALTMAN stated that Salesman #1 was "playing games with the money situation" because Salesman #1 "decided to pay us three instead of five."  Defendant WALTMAN stated "forget it" because "we have a guy who's willing to pay more."  Defendant WALTMAN stated that LST's Board of Supervisors was going to "rubber stamp it."  Defendant WALTMAN instructed Person #2 to tell Salesman #1 that someone from a local organization would show up to LST's Board of Supervisors meeting and oppose Company #1's billboard.  Defendant WALTMAN stated, "I guarantee that's going to change things." <br><br> (b)  On November 8, 2016, at approximately 5:20 p.m., defendant WALTMAN called Salesman #1 and stated that a local organization was not comfortable with Company #1's proposed billboard.  During this conversation, Salesman #1 asked if the sticking point was the "consulting fee" for RAFF'S CONSULTING. Defendant WALTMAN confirmed that Company #1's payment to RAFF'S CONSULTING had to be $5,000. |

---

[1]      All of the text messages and other materials quoted in this Second Superseding Indictment bear the same spelling, punctuation, and grammar as found in the originals of these records.  Unless specifically indicated, all conversations and statements described in this Second Superseding Indictment are related in substance and in part.

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | Defendant WALTMAN stated that he would tell "RAFF'S CONSULTING to forget about it."  Salesman #1 asked, "Where is [Solicitor #1] in all of this?"  Defendant WALTMAN stated that Solicitor #1 was "one of us."  Salesman #1 stated, "Let's shake hands" and that he would "do five."<br><br>(c)  On November 9, 2016, beginning at approximately 9:19 a.m., defendant WALTMAN and Salesman #1 exchanged text messages.  Defendant WALTMAN stated that he would meet with Solicitor #1 later that day.  Salesman #1 asked to speak to defendant WALTMAN before WALTMAN spoke to Solicitor #1. |
| SEVENTEEN | On November 9, 2016, at approximately 12:03 p.m., defendant WALTMAN used a facility in interstate commerce to call Salesman #1 to further discuss Company #1's payment to RAFF's CONSULTING.  Salesman #1 described "two buckets" of offers: an offer from Company #1 to RAFF'S CONSULTING for $7,000 and an offer from Company #1 to LST for $58,000 per year in lease payments.  Salesman #1 asked defendant WALTMAN if there was a way to increase Company #1's payment to RAFF'S CONSULTING while decreasing Company #1's annual lease payments to LST.   Defendant WALTMAN responded, "You're sweetening the pot. I like it."  During the call, Salesman #1 offered a payment of up to $15,000 to RAFF'S CONSULTING if | (a)  On November 9, 2016, at approximately 12:18 p.m., defendant WALTMAN called Solicitor #1.  Defendant WALTMAN and Solicitor #1 agreed to meet at the Buck Hotel at 4 p.m. that afternoon.<br><br>(b)  On November 9, 2016, at approximately 1:54 p.m., defendant WALTMAN called defendant HOOPES.  Defendant WALTMAN stated that he was meeting Solicitor #1 at the Buck Hotel at 4 p.m. that afternoon. Defendant WALTMAN stated that it would only take five minutes to tell Solicitor #1 what was going on.<br><br>(c)  On November 9, 2016, at approximately 4:50 p.m., defendant WALTMAN called Salesman #1.  Defendant WALTMAN stated that Company #1 was getting special zoning for its billboard.  Defendant |

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
|  | defendant WALTMAN could lower Company #1's lease payments to LST to $36,000 per year. Defendant WALTMAN stated that he would talk to Solicitor #1 about these offers. | WALTMAN stated that LST wanted to keep the billboard around the original price. Defendant WALTMAN stated, "It's trickle-down economics, so everybody will be happy." Defendant WALTMAN and Salesman #1 discussed possible payments to both LST and RAFF's CONSULTING. Defendant WALTMAN stated that he would try to get LST to agree to "56." Salesman #1 offered to pay RAFF's CONSULTING "eight" if LST agreed to "56." Defendant WALTMAN balked at the offer of $8,000 to RAFF's CONSULTING. Defendant WALTMAN stated that Solicitor #1 would generally clear Company #1's billboard project that evening with an LST officer and LST's Board of Supervisors, and then WALTMAN and Salesman #1 would talk specific numbers the following day.<br><br>(d) On November 12, 2016, at approximately 2:12 p.m., defendant WALTMAN and Solicitor #1 exchanged text messages. Solicitor #1 stated that LST's Board of Supervisors was "good with moving on Russell Elliott sign" and "We should talk numbers soon." Defendant WALTMAN stated "I appreciate it keep your eye on the ball" and "This year I'm back in the box we take as much ground as we can"<br><br>(e) On November 15, 2016, beginning at approximately 12:14 p.m., defendant WALTMAN and Solicitor #1 exchanged text messages. Solicitor #1 stated that he spoke to Salesman #1. Defendant WALTMAN and Solicitor |

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | | #1 agreed to meet for lunch the following day for further discussions.<br><br>(f)  On November 16, 2016, at approximately 10:03 a.m., defendant WALTMAN called defendant HOOPES to ask HOOPES to attend the lunch meeting with Solicitor #1. Defendant HOOPES agreed to attend the lunch meeting.<br><br>(g)  On or about November 16, 2016, at approximately 12:50 p.m., Solicitor #1 sent a text message to Salesman #1, stating, "[Salesman #1]: At lunch with JW. Lower South lease should be for $55k. Revise and send me term sheet. $10k to consultant. Any questions let me know."<br><br>(h)  On November 16, 2016, at approximately 2:06 p.m., Solicitor #1 sent a text message to Salesman #1, stating, "We need to talk tomorrow about the consultant deal.  Nothing bad. Just need to iron out details."<br><br>(i)  On or about November 17, 2016, at approximately 2:37 p.m., Solicitor #1 sent a text message to defendant WALTMAN, stating, "Spoke to [Salesman #1].  Let me know when we can talk." |
| EIGHTEEN | On November 17, 2016, at approximately 3:15 p.m., defendant WALTMAN used a facility in interstate commerce to call Solicitor #1, who stated that he was "not happy" with Salesman #1. According to Solicitor #1, Salesman #1 raised Company #1's offer to | (a)  On November 18, 2016, at approximately 8:39 a.m., Salesman #1 sent an email to Solicitor #1 attaching a "Display Lease Agreement," in which Company #1 offered $55,020 per year to LST for the billboard in Russell Elliott Memorial Park for a lease term of approximately 30 years. |

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | $60,000 per year to LST. Solicitor #1 stated, "Then we get into the discussion about, he's got to do some consulting thing. Fine, no problem. He's willing to do it, but he wants to start jiggling the numbers. So then he starts talking about what we talked about yesterday: 55, 10." Defendant WALTMAN stated, "Yeah." Solicitor #1 later stated, "I am assuming, because he now wants to take the Township's rent from $60,000 a year to $55,000 a year over 30 years, John, that's $150,000 that I'm putting back in his pocket." Defendant WALTMAN stated, "Right." Solicitor #1 stated, "And he wants to give you 10. Period." Defendant WALTMAN laughed. Solicitor #1 stated that he told Salesman #1, "Do you think I was born yesterday? Do you think I don't have a simple calculator? I can't do math? Why would I agree, if you are now only going to take out 10,000 in the, in the consulting, finder fee, whatever, in the first year. Then why am I not talking about reducing the first year's rent and then going back to the 60,000 that I know you can pay because you already offered it to me?" Defendant WALTMAN stated, "That's right." Solicitor #1 stated that he told Salesman #1, "Why would you think that I would give you back 150,000 so you can keep 140. Fuck you. I'm not ever going to do that." Defendant WALTMAN stated, "Yeah." Solicitor #1 also stated that he told Salesman #1, "Why would I ever agree to reduce | (b) On December 2, 2016, at approximately 8:28 a.m., defendant HOOPES met Solicitor #1 to discuss payments from Company #1 to RAFF's CONSULTING and the pending federal investigation of defendant WALTMAN, HOOPES, and others.<br><br>(c) On December 6, 2016, at approximately 12:32 p.m., Person #2 called defendant WALTMAN. Person #2 stated, "I just talked to the sign guy." Person #2 stated that he told Salesman #1 that Person #2 heard a rumor that Salesman #1 "may have said something to [Solicitor #1] about the FBI and extortion, and what have you." According to Person #2, Salesman #1 was "real nervous" and denied speaking to the FBI. Person #2 stated that Salesman #1 was expecting LST's Board of Supervisors to meet on December 14, 2016 to approve Company #1's billboard project. Defendant WALTMAN stated, "I don't know where that extortion and other shit came from. That kind of pissed me off." Person #2 again stated that Salesman #1 was now "real nervous." Defendant WALTMAN stated, "Alright, good." |

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|---|---|---|
| | my rent for 30 years, so you can give my, give John one payment? Why would I ever fucking do that?" Defendant WALTMAN asked, "And what'd he say?"  After mocking Salesman #1's response, Solicitor #1 stated that he told Salesman #1, "Fine, you don't want to pay him on a long-term contract, I'll go back and I'll talk to John, but I'm not reducing this rent for every year for the next 30 years." Defendant WALTMAN stated, "Agreed."  Solicitor #1 stated that he told Salesman #1, "If you want to only carve out one payment, then I am not reducing the rent for forever.  Period."  Defendant WALTMAN instructed, "Stay on him.  He'll come back.  Shut him down, and he'll come back."  Defendant WALTMAN further stated, "You have complete control of this.  You make the decision, okay?  Alright." Solicitor #1 stated, "I am going to squeeze his balls, John."  Defendant WALTMAN stated, "Okay, good.  I have faith in you.  Alright?  We'll talk..."  Solicitor #1 stated, "I mean, you're okay, you're okay if…" Defendant WALTMAN stated, "I'm okay with you."  Solicitor #1 stated, "If it's only a one-time…" Defendant WALTMAN stated, "You do your, well, if he does a one-time deal…"  Solicitor #1 stated, "It's gotta be bigger." Defendant WALTMAN agreed, "It's gotta be bigger than that, you know what I mean?"  Solicitor #1 stated, "Yeah.  Well, that's what I'm thinking.  And what I might squeeze him to do is, we do maybe two | |

| COUNT | USE OF FACILITY IN INTERSTATE COMMERCE | SUBSEQUENT ACTS |
|-------|----------------------------------------|-----------------|
|       | payments: maybe the first year it's at 20, and the second year, it's at 10, or something.  We do something, we, I gotta get you more than a one-shot, fucking five or seven thousand dollars that he's trying to do.  That's bullshit."  Defendant WALTMAN stated, "Stay on him.  Stay on him.  Thank you."  Solicitor #1 stated, "I will.  I will." | |

All in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT NINETEEN
### (Hobbs Act Extortion Under Color of Official Right)

**THE GRAND JURY FURTHER CHARGES THAT**:

1.      Paragraphs 1 through 9 and the Uses of Facilities in Interstate Commerce and Subsequent Acts in Paragraph 10 of Counts Sixteen through Eighteen are incorporated here.

2.      From at least in or about November 8, 2016 to in or about December 16, 2016, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN I. WALTMAN**
**and**
**ROBERT P. HOOPES**

knowingly obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, and aided and abetted that conduct; that is, defendants WALTMAN and HOOPES, while public officials, engaged in a course of conduct whereby WALTMAN and HOOPES, attempted to obtain, under color of official right, bribe payments paid to RAFF's CONSULTING from Company #1, which money was not due to WALTMAN and HOOPES.

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNTS TWENTY AND TWENTY-ONE
### (Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT**:

1.      Paragraphs 1 through 9 and the Uses of Facilities in Interstate Commerce and Subsequent Acts in Paragraph 10 of Counts Sixteen through Eighteen are incorporated here.

2.      Defendants JOHN I. WALTMAN and ROBERT P. HOOPES attempted to defraud LST by lowering the amount of annual lease payments Company #1 would pay to LST for Company #1's billboard project in LST's Russell Elliott Memorial Park in exchange for one or more bribe payments from Company #1 to defendants WALTMAN and HOOPES through RAFF's CONSULTING.

3.      On or about the below dates, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN I. WALTMAN**
**and**
**ROBERT P. HOOPES,**

together and with others known and unknown to the grand jury, devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme to defraud, attempting to do so, and aiding and abetting its execution, knowingly caused to be transmitted, by means of wire communication in interstate commerce, the writings, signs, signals, pictures, and sounds described below:

| COUNT | DATE | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|---|
| TWENTY | November 8, 2016 | Defendant WALTMAN sent a text message from Bucks County, Pennsylvania via at least one of Apple's iMessage servers, located outside Pennsylvania, to Salesman #1 stating, "Hey [Salesman #1] sounds like you did a really good job sorry to say that the opposition from certain leaders from [local organizations] have decided to combat your sign location I don't think the board will want to make that decision with all the controversy starting to come your way Good luck for trying" |
| TWENTY-ONE | November 9, 2016 | Defendant WALTMAN sent a text message from Bucks County, Pennsylvania via at least one of Apple's iMessage servers, located outside Pennsylvania, to Salesman #1, stating, "Meeting with [Solicitor #1] today" |

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2.

## NOTICE OF FORFEITURE No. 1

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section 1956, set forth in this Second Superseding Indictment, defendants

**JOHN I. WALTMAN,**
**ROBERT P. HOOPES,**
**BERNARD T. RAFFERTY,**
**and**
**KEVIN M. BIEDERMAN**

shall forfeit to the United States of America any and all property involved in such offenses, and any property traceable to such property, including, but not limited to, the sum of $80,000.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(1).

## NOTICE OF FORFEITURE No. 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Sections 1341, 1343, and 1951, set forth in this Second Superseding Indictment, defendants

**JOHN I. WALTMAN,**
**ROBERT P. HOOPES,**
**and**
**BERNARD T. RAFFERTY**

shall forfeit to the United States of America any and all property involved in such offenses, and any property traceable to such property, including, but not limited to, the sum of $1,000.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

> (f)      cannot be located upon the exercise of due diligence;
>
> (g)      has been transferred or sold to, or deposited with, a third party;
>
> (h)      has been placed beyond the jurisdiction of the Court;
>
> (i)      has been substantially diminished in value; or
>
> (j)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

43

## NOTICE OF FORFEITURE No. 3

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violation of Title 18, United States Code, Section 215(a)(2), set forth in this Second Superseding Indictment, defendant

### KEVIN M. BIEDERMAN

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, as charged in this information, including but not limited to $1,600.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

4.      cannot be located upon the exercise of due diligence;

5.      has been transferred or sold to, or deposited with, a third party;

6.      has been placed beyond the jurisdiction of the Court;

7.      has been substantially diminished in value; or

8.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(2).

## NOTICE OF FORFEITURE No. 4

**THE GRAND JURY FURTHER CHARGES THAT:**

1.	As a result of the violations of Title 18, United States Code, Section 1951, set forth in this Second Superseding Indictment, defendant

### JOHN I. WALTMAN

shall forfeit to the United States of America any and all property involved in such offenses, and any property traceable to such property, including, but not limited to, the sum of $4,000.

2.	If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

(k)	cannot be located upon the exercise of due diligence;

(l)	has been transferred or sold to, or deposited with, a third party;

(m)	has been placed beyond the jurisdiction of the Court;

(n)	has been substantially diminished in value; or

(o)	has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461, incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

45

property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____
FOREPERSON

_____
LOUIS D. LAPPEN
United States Attorney